# UNITED STATES DISTRICT COURT

### for the

### District of Oregon

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 3:25-mc-00827 |
| Black iPhone with a cracked screen and a black Android Samsung, currently located at FBI Eugene Resident Agency | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Black iPhone with a cracked screen and a Black Android, Samsung currently located at FBI Eugene Resident Agency, as described in Attachment A hereto,

located in the _____ District of _____ Oregon _____, there is now concealed *(identify the person or describe the property to be seized)*:
The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1591, 2251(a), 2421, 2422(a), 2422(b) and 2423 | Sexual Exploitation of Children, Transport, Coercion or enticement, Use of mail or any facility or means of interstate or foreign commerce, and Harbor or transport and individual under 18 to engage in prostitution |

The application is based on these facts:
See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Hunter E. Fikes, via Telephone
*Applicant's signature*

_____
Hunter Fikes, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 22, 2025 at 12:25 p.m.

_____
*Andrew Hallman*
*Judge's signature*

City and state: Eugene, Oregon

Andrew D. Hallman, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss:          AFFIDAVIT OF HUNTER E. FIKES

**Affidavit in Support of an Application Under Rule 41
for a Warrant to Search and Seize Evidence Including Digital Evidence**

I, Hunter E. Fikes, being duly sworn, do hereby depose and state as follows:

**<u>Introduction and Agent Background</u>**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

been since December 2022.   My current assignment involves investigating child exploitation

crimes.   My training and experience include investigating federal criminal violations related to

child exploitation and child pornography, as well as other federal violations.   Prior to working

for the FBI, I worked for the Metropolitan Nashville Police Department where I was a Detective

in the Crimes Against Children Unit for three years, during which time I gained experience

conducting these types of investigations.   I have observed and reviewed numerous examples of

child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer

media, during my time working child exploitation crimes.   Moreover, I am a federal law

enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251,

2422, and 1591, and I am authorized by law to request a search warrant.

2.      I submit this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the search and examination of the

following items:

- Black iPhone with a cracked screen (hereinafter "Device 1")

- Black Android, Samsung, bearing International Mobile Equipment Identity
  (IMEI) 355563579878750 (hereinafter "Device 2")

**Affidavit of Hunter E. Fikes**                                          **Page  1**

which are currently stored, in law enforcement possession, at the FBI Eugene Resident Agency,

as described in Attachment A hereto, and the extraction of electronically stored information from

Device 1 and Device 2 (hereinafter collectively, "Devices"), as described in Attachment B

hereto.   As set forth below, I have probable cause to believe and do believe that the items set

forth in Attachment B constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C.

§ 1591 (harbor or transport an individual under 18 to engage in prostitution), 2251(a) (inducing

or coercing a minor to engage in any sexually explicit conduct for the purposes of producing any

visual depiction), 2421 (transport any individual in interstate or foreign commerce to engage in

prostitution), 2422(a) (coercion or enticement to travel in interstate commerce for prostitution);

2422 (b) (use of mail or facility or means of interstate or foreign commerce to induce or coerce

an individual under 18 to engage in prostitution), and 2423(a) (use of interstate or foreign

commerce to transport a minor to engage in prostitution) (hereinafter "Target Offenses") as

described in Attachment B.

    3.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.   The facts

set forth in this affidavit are based on my own personal knowledge, knowledge obtained from

other individuals during my participation in this investigation, including other law enforcement

officers, interviews of witnesses, a review of records related to this investigation,

communications with others who have knowledge of the events and circumstances described

herein, and information gained through my training and experience.

/ / /

/ / /

**Affidavit of Hunter E. Fikes**                                        **Page  2**

## Applicable Law

4.     I believe there is probable cause to believe that evidence of the following

violations (Target Offenses) will be found in the places to be searched:

- 18 U.S.C. § 1591 – Harbor or transport an individual under 18 to engage in

  prostitution.

- 18 U.S.C. § 2251(a) – Sexual Exploitation of Children: This statute targets

  individuals who induce or coerce a minor to engage in any sexually explicit

  conduct for the purposes of producing any visual depiction.

- 18 U.S.C. § 2421 – Transport any individual in interstate or foreign commerce

  with the intent that such individual engages in prostitution.

- 18 U.S.C. § 2422(a) – Coercion or enticement of any individual to travel in

  interstate or foreign commerce to engage in prostitution.

- 18 U.S.C. § 2422(b) – Use of mail or any facility or means of interstate or foreign

  commerce to induce or coerce an individual under 18 to engage in prostitution.

- 18 U.S.C. § 2423 – Transportation of Minors: Use of interstate or foreign

  commerce to transport a minor to engage in prostitution.

## Statement of Probable Cause

5.     Law enforcement is investigating Anthony Crawford for suspected sex trafficking

of female minors and adults from the Eugene/Springfield area in Oregon to Portland and

Washington State.

### Minor Victim 1

6.     On August 6, 2024, Oregon Child Protective Services (CPS) received a call from

a mandatory reporter whose sister was friends with a minor victim (hereinafter "MV1"). The mandatory reporter's sister was concerned MV1 was being sex trafficked in Washington State. These concerns were brought to Oregon CPS due to social media posts in which MV1 was depicted in photographs wearing sexually explicit clothing and tagged in locations in Washington State, specifically in and around Spokane, Washington. At the time of the report to Oregon CPS, MV1 was listed as a missing/runaway juvenile out of Oregon and had an outstanding felony warrant.

7.     Washington State Department of Child, Youth & Families (DCYF) received the report from Oregon CPS due to the location of MV1 being in Washington State. Washington DCYF then reported the matter to the Spokane Police Department in Spokane, Washington, as that is where many of MV1's social media posts indicated she might be.

8.     Spokane Police Department followed up with the mandatory reporter for more information and were able to locate online prostitution ads posted in Eugene, Portland, and Seattle, for a female who appeared to be MV1. The most recent prostitution ads investigators with the Spokane Police Department were able to find were posted on Megapersonals.eu in Seattle on or around August 8, 2024, at approximately 4:28am. Listed telephone numbers in the prostitution ads included 541-368-2607, 458-356-6457, and 971-431-9008. Investigators with Spokane Police contacted FBI Seattle with the report and information regarding MV1.

9.     After receiving the report from Spokane Police on August 8, 2024, Special Agents with FBI Seattle attempted to contact the following number for MV1 from the ad: 971-431-9008. A text message was sent to the phone number but went unanswered. Special Agents with FBI Seattle then sent an exigent request to AT&T, which was the provider associated with phone

**Affidavit of Hunter E. Fikes**                                              **Page 4**

number 971-431-9008, based on the active escort advertisement and potential for commercial sexual exploitation.   AT&T provided location information for the phone number, which resolved to an area near the intersection of Aurora Avenue North and North 125th Street in Seattle.   This location was known to Special Agents with FBI Seattle to be an area associated with open air commercial sex.

10.     On the evening of August 8, 2024, Special Agents with FBI Seattle recovered MV1 in an area consistent with the area phone number 971-431-9008 was pinging.   MV1 appeared to be engaged in prostitution at the time due to the area she was in and based on the ads that were observed by law enforcement on a known prostitution site.   Additionally, MV1 appeared to be working alongside an adult female at the time she was recovered.   FBI Seattle conducted an initial interview of MV1 after she was recovered.   MV1 provided information the adult female she was with at the time of her recovery obtained the hotel room for her, taught her the rules, and generally looked out for her.   MV1 denied having a trafficker at the time.

11.     MV1 was arrested during the incident for an outstanding felony warrant out of Oregon.   During a search incident arrest, the Devices were collected and seized from MV1's person, as were five Trojan condoms.

12.     A few days after MV1 was recovered in August 2024, Eugene Police Department (EPD) received a report from an additional witness that a Kaytlynn Crawford (K. Crawford) stated her husband, Anthony (Crawford), was engaged in sex trafficking.   Crawford reportedly transported women, including underaged girls, between Eugene, Portland, and Washington State. The witness indicated K. Crawford referred to a 17-year-old girl who was recently arrested by the FBI in Seattle.   EPD referred the matter to FBI Eugene, who believed the 17-year-old was

**Affidavit of Hunter E. Fikes**                                                     **Page 5**

likely MV1 whose case had already been referred to FBI Seattle.

13.    On July 10, 2024, MV1 was forensically interviewed at Kids FIRST, a child

advocacy center (CAC) in Eugene, Oregon.   MV1 identified a man named Anthony, who went

by "Black," as her trafficker.   Black/Anthony is believed to be Anthony Crawford.   Subscriber

information from telephone number 458-356-6457, which appeared on MV1's prostitution ads,

resolved to Anthony's wife, K. Crawford, address 3225 Kinsrow Ave. Apt 74, Eugene, OR

97401.   K. Crawford was the owner of the account from January 13, 2023, to September 19,

2024, which includes the time period MV1 was arrested in Seattle, Washington.

14.    Numerous witnesses, including MV1, have indicated Anthony Crawford would

use K. Crawford's identity for such things as creating web accounts and renting vehicles to drive

girls to Portland and Seattle.   Telephone number 458-356-6457 contacted or attempted to

contact a number believed to be associated with MV1, 971-431-9008, approximately 253 times

beginning on or around August 3, 2024, and ending on or around August 9, 2024.   MV1 was

arrested in Seattle on August 8, 2024.

15.    MV1 disclosed that the Devices recovered from her person during the arrest were

used to communicate with Crawford for the purposes of prostitution and used to take sexually

explicit photographs of herself to send to him.   Additionally, MV1 disclosed that Crawford had

access to the Devices and would monitor MV1's use of the Devices.

16.    MV1 disclosed during the interview that she communicated with Crawford via

Instagram while she was being prostituted.   MV1 was shown the image below during the

forensic interview, which MV1's father obtained from MV1's friend when they were trying to

recover her from Seattle in August 2024:

**Affidavit of Hunter E. Fikes**                                                                                   **Page  6**




MV1 recognized the account "blaxkpeso" as the one Crawford used to communicate with her via Instagram in furtherance of the Target Offenses.   Instagram account "blaxkpeso" provided telephone number 458-356-6457 to MV1's friend as a contact number.   Thus, telephone number 458-356-6457 was registered to Crawford's wife and provided to MV1's friend from an Instagram account MV1 recognized as belonging to Crawford.   FBI Eugene also learned from Lane County Parole & Probation that Crawford had previously provided 458-356-6457 as his primary contact number before the account was discontinued in September 2024.

16.     MV1 stated during her interview that Crawford would rent hotel rooms for her, set up costumers seeking to have sex with her, set prices, arrange for the customers to meet MV1 at the hotel rooms, and take the money from MV1 after the customers paid.   If MV1 did not do what Crawford told her, he would physically abuse her.   Crawford held MV1 against her will in these hotel rooms and refused to return her to Eugene despite her not wanting to engage in sex work for him.   Additionally, MV1 stated Crawford had sex with her on two separate occasions,

**Affidavit of Hunter E. Fikes**                                                    **Page  7**

and he would also direct her to take nude photographs of herself and send them to him via the Devices so he could distribute them for money.

## Victim 2

17.     On May 31, 2025, another victim (V2) reported to EPD that she was involved in a prostitution ring in the Eugene area.   The report listed Crawford as the subject.   Crawford had left her for a few days, and she was scared.   V2 reported Crawford saying things like, "If you ever leave, I'll kill you."   Crawford would provide V2 alcohol and food, but he never paid her any of the money she earned.

18.     V2 subsequently spoke to the FBI and stated that she met Crawford on a dating site called BLK.   After meeting on the dating site, they set up an in-person meeting at Dave's Hot Chicken in Eugene during the first or second week of May 2025.   When V2 got into Crawford's car after leaving the restaurant, Crawford told V2 that he was a pimp, and she was going to work for him now.   Crawford took V2 to the Motel 6 in Springfield where she checked into a room using her name.   Crawford made ads for her on MegaPersonals (the same site he reportedly used to set up MV1's ads) and Skip the Games.   V2 had two customers the first night.   They would place the money on the dresser when they were done, and Crawford would come in and take all the money once they left.

19.     V2 remembered Crawford driving her to Portland, Oregon, where they got a motel near 82nd or 83rd Street.   V2 would walk along the street and take customers back to the motel.   V2 remembered being up in Portland for about a week and had approximately 10 customers.   One night, V2 was with Crawford in Portland when she thought Portland Police observed Crawford being aggressive with her.   Crawford was arrested and released not long

after.    He picked V2 up and took her back to the Motel 6 in Springfield where she booked another room in her name and worked for Crawford for another 14 days or so.

20.    FBI Eugene obtained police reports from Portland Police Bureau (PPB) to corroborate information V2 had provided about Crawford being arrested in Portland while prostituting her.    On May 14, 2025, PPB received a call from a citizen reporting likely sex work activity.    PPB responded to the area and observed a black sedan that was occupied.    PPB contacted Crawford and V2 at the sedan.    Crawford was taken into custody on a felony parole violation warrant.    PPB documented in their reporting of the contact that there were several indicators leading them to believe V2 was engaged in prostitution and Crawford was likely the trafficker or facilitator of the sex work.

21.    Beginning on or around May 2 to on or around May 31, 2025, there were approximately 598 phone contacts between telephone number 541-936-7507 and V2's telephone number.    Subpoena returns indicate telephone number 541-936-7507 belongs to customer/subscriber Anthony Crawford.    Additionally, Crawford provided telephone number 541-936-7507 to Lane County Parole & Probation as his current contact number.    These contacts between Crawford and V2 included contact on the evening of May 14, 2025, the night Crawford was arrested by Portland Police Bureau (PPB) while with the victim in what PPB suspected was a trafficking situation.    In the PPB report, it was noted that Crawford was on his phone texting someone named "Baby" prior to his arrest.

22.    I have probable cause to believe, and do believe, that Anthony Crawford communicates with his victims using cell phones and/or digital devices like Device 1 and Device 2 in furtherance of the Target Offenses.    Crawford appears to have used mobile numbers and

**Affidavit of Hunter E. Fikes**                                                                                    **Page  9**

applications to communicate extensively with his victims, contacting or attempting to contact

both MV1 and V2 hundreds of times around the time they were suspected of being trafficked.

Additionally, MV1 reported using the Devices seized from her person upon her arrest in Seattle

to communicate with Crawford.

17.    Based on the information listed above, I have probable cause to believe, and I do

believe the Devices further described in Attachment A, that were seized from the person of MV1

on August 8, 2024, contain evidence of the Target Offenses.

18.    The Devices are currently in the lawful possession of the FBI and have been since

their seizure on August 8, 2024.   The Devices came into the FBI's possession following their

discovery on MV1's person during the search incident to arrest.   The Devices were stored with

FBI Seattle until July 2025, at which time FBI Seattle transferred them to the FBI Eugene

Resident Agency.

19.    The Devices are currently in storage at FBI Eugene Resident Agency, which is

located in Eugene, Oregon.   In my training and experience, I know that the Devices have been

stored in a manner in which its contents are, to the extent material to this investigation, in

substantially the same state as they were when the Devices first came into the possession of the

FBI.

### Search and Seizure of Digital Data

20.    Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.    *Wireless telephone*.   A wireless telephone (or mobile telephone, or

cellular telephone) is a handheld wireless device used for voice and data communication through

**Affidavit of Hunter E. Fikes**                                               **Page  10**

radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

　　　　　b.　　*Digital camera*.  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images.   Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   This storage media can contain any digital data, including data unrelated to photographs or videos.

　　　　　c.　　*Portable media player*.  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include

**Affidavit of Hunter E. Fikes**　　　　　　　　　　　　　　　　　**Page  11**

various types of flash memory cards or miniature hard drives.   This removable storage media

can also store any digital data.   Depending on the model, a portable media player may have the

ability to store very large amounts of electronic data and may offer additional features such as a

calendar, contact list, clock, or games.

        d.     *GPS*.   A GPS navigation device uses the Global Positioning System to

display its current location.   It often contains historical records of the locations where it has

been.   Some GPS navigation devices can give a user driving or walking directions to another

location.   These devices can contain records of the addresses or locations involved in such

navigation.   The Global Positioning System (generally abbreviated as "GPS") consists of 24

NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock.

Each satellite repeatedly transmits by radio a mathematical representation of the current time,

combined with a special sequence of numbers.   These signals are sent by radio, using

specifications that are publicly available.   A GPS antenna on Earth can receive those signals.

When a GPS antenna receives signals from at least four satellites, a computer connected to that

antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude

with a high level of precision.

        e.     *PDA*.   A personal digital assistant, or PDA, is a handheld electronic

device used for storing data (such as names, addresses, appointments, or notes) and utilizing

computer programs.   Some PDAs also function as wireless communication devices and are used

to access the Internet and send and receive email.   PDAs usually include a memory card or other

removable storage media for storing data and a keyboard and/or touch screen for entering data.

Removable storage media include various types of flash memory cards or miniature hard drives.

**Affidavit of Hunter E. Fikes**                                                     **Page  12**

This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

       f.    *Tablet*.   A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.   Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.   Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.   Apps can, for example, permit accessing the Web, sending and receiving email, and participating in Internet social networks.

       g.    *Pager*.   A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.   Some pagers enable the user to send, as well as receive, text messages.

       h.    *Storage medium*.   A storage medium is any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

       i.    *IP address*.   An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP

**Affidavit of Hunter E. Fikes**                                                                 **Page  13**

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        j.    *Internet*.   The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    21.    Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

    22.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

    23.    As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on the Devices because, based on my knowledge, training, and experience, I know:

        a.    Data on the Devices can provide evidence of a file that was once on the Devices but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph

**Affidavit of Hunter E. Fikes**                     **Page  14**

that has been deleted from a word processing file or a text message)

      b.    Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the device at a relevant time.   Further, forensic evidence on a device can show how and when the device was accessed or used.   Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access, use, and events relating to the crime under investigation.   This "timeline" information may tend to either inculpate or exculpate the device user.   Last, forensic evidence on a device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation.   For example, information on a device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a computer (e.g., logs indicating that the incriminating information was accessed with a particular program).

      c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

**Affidavit of Hunter E. Fikes**                                      **Page  15**

d.      The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses an electronic device to commit a crime such as sex trafficking of a minor and communicating with a minor over social medial platforms and text messaging for the purpose of child exploitation, the electronic device will generally serve both as an instrumentality for committing the crime and as a storage medium for evidence of the crime.   From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offenses.

24.    *Nature of examination*.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices

**Affidavit of Hunter E. Fikes**                                    **Page  16**

consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

25.     The initial examination of the Devices will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.   If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.   The government shall complete this review within 180 days of the date of execution of the warrant.   If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

26.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Devices or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.   Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

27.     If an examination is conducted, and it is determined that the Devices do not contain any data falling within the ambit of the warrant, the government will return the Devices to its owner within a reasonable period of time following the search and will seal any images of the Devices, absent further authorization from the Court.

**Affidavit of Hunter E. Fikes**                                                                      **Page  17**

28.     If the Devices contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Devices as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Devices and/or the data contained therein.

29.     The government will retain forensic images of the Devices for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

30.     *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

31.     Based on my training, experience, and discussions with other investigators, I believe analysis of the Devices will reveal evidence of and/or victims of child exploitation and child pornography and/or evidence of attempted child exploitation and sex trafficking and prostitution of individuals including minors.

32.     I also know, based on my training and experience, that many current cellular telephones are basically small computers.   Many of them have the ability to send text messages, email messages, access the Internet, and to store mass quantities of information.   I know that many people use their phones as computers and it's feasible that a cellular telephone could have

been used in this case to exploit other children.

<u>Conclusion</u>

33.    Based on the foregoing, I have probable cause to believe, and I do believe, that

the Devices described in Attachment A contain evidence, fruits, and instrumentalities of

violations of 18 U.S.C. § 1591 (harbor or transport an individual under 18 to engage in

prostitution), 2251(a) (inducing or coercing a minor to engage in any sexually explicit conduct

for the purposes of producing any visual depiction), 2421 (transport any individual in interstate

or foreign commerce to engage in prostitution), 2422(a) (coercion or enticement to travel in

interstate commerce for prostitution); 2422 (b) (use of mail or facility or means of interstate or

foreign commerce to induce or coerce an individual under 18 to engage in prostitution), and

2423(a) (use of interstate or foreign commerce to transport a minor to engage in prostitution) as

set forth in Attachment B.   I therefore request that the Court issue a warrant authorizing a search

of the Devices described in Attachment A for the items listed in Attachment B and the seizure

and examination of any such items found.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Affidavit of Hunter E. Fikes**                                          **Page  19**

34.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney (AUSA) Joseph Huynh.   I was informed that in AUSA Huynh's opinion, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
HUNTER E. FIKES
Special Agent FBI

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at ___12:25 p.m.___ a.m./p.m. on July __22__, 2025.

*Andrew Hallman*
_____
ANDREW D. HALLMAN
United States Magistrate Judge

**Affidavit of Hunter E. Fikes**                                    **Page  20**

**ATTACHMENT A**

**Property to Be Searched**

The property to be searched is as follows:

- Black iPhone (unknown model) with a cracked screen

 

- Black Android, Samsung bearing Internation Mobile Equipment Identity (IMEI) 355563579878750

 

The Devices are currently located on the premises of FBI Eugene Resident Agency located in Eugene, Oregon.

**Attachment A**                                                                                    **Page 1**

**ATTACHMENT B**

**Items to Be Seized**

1.      All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1591 (harbor or transport an individual under 18 to engage in prostitution), 2251(a) (inducing or coercing a minor to engage in any sexually explicit conduct for the purposes of producing any visual depiction), 2421 (transport any individual in interstate or foreign commerce to engage in prostitution), 2422(a) (coercion or enticement to travel in interstate commerce for prostitution); 2422 (b) (use of mail or facility or means of interstate or foreign commerce to induce or coerce an individual under 18 to engage in prostitution), and 2423(a) (use of interstate or foreign commerce to transport a minor to engage in prostitution) since May 1, 2024, to the day of seizure on August 8, 2024, including:

        a.      Any and all records, documents, or materials, including correspondence, that pertain to the production, possession, receipt, transportation, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

        b.      Any records, documents, or materials, including correspondence, that pertain to any conversations with the Minor and potential subjects described in the affidavit in support of the search warrant application in any form including Instagram, or any other social media platform;

        c.      Any records, documents, or materials, including any record related to the creation of or any correspondence to / from any Instagram account described in the affidavit in support of the search warrant application in any form;

**Attachment B**                                                                                          **Page 1**

d.      Any records, documents, or materials, including any correspondence, that involve any communication with any person that appear to be coercive in nature for the purposes of grooming or obtaining images from any person;

e.      Any records, documents, or materials, including correspondence, that pertain to the production, transportation, distribution, receipt, or possession of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

f.      All originals and copies of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

g.      Any motion pictures or digital video clips of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; video recordings which are self-produced and pertain to sexually explicit images of minors; or video recordings of minors which may assist in the location of minor victims of child exploitation or child abuse;

h.      Any records, documents, or materials which include offers to transmit, through interstate commerce by any means (including by computer), any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

i.      Any records, documents, or materials relating to the production, reproduction, receipt, shipment, trade, purchase, or a transaction of any kind involving the transmission, through interstate commerce (including by computer), of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United

**Attachment B**                                                               **Page 2**

States Code, Section 2256;

j.      Any records, documents, or materials naming or identifying minors visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

k.      Any records of Internet usage, including records containing screen names, usernames, and e-mail addresses, and identities assumed for the purposes of communication on the Internet on any app installed on the Devices.  These records include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage media, including CDs or DVDs;

l.      Any records, documents, or materials referring or pertaining to communications with others, whether in person, by telephone, or online, for the purpose of distributing or transporting child pornography, sex trafficking, and prostitution work including chat logs, call logs, address book or contact list entries, digital images sent or received;

m.      Information or evidence of any websites visited, photographs, videos, images, reports, definitions, stories, books, music, lyrics, emails, videos, messages, and or notes associated with child pornography or those who collect, disseminate, or trade in child pornography; and

n.      Any records, documents, materials, videos, or photographs that would allow investigators to ascertain who used the Devices;

o.      Any records, documents, or materials, including any correspondence, that involve any communication with any person that appear to be related to sex trafficking or

**Attachment B**                                                                            **Page 3**

prostitution.

2.      As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form including digital or electronic form.

**Search Procedure**

3.      The examination of the Devices may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

4.      The initial examination of the Devices will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.  If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.  The government shall complete this review within 180 days of the date of execution of the warrant.  If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

5.      If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Devices or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the

**Attachment B**                                                                                   **Page 4**

warrant, through the conclusion of the case.

6.      If an examination is conducted, and it is determined that the Devices do not contain any data falling within the ambit of the warrant, the government will return the Devices to its owner within a reasonable period of time following the search and will seal any image of the Device, absent further authorization from the Court.

7.      If the Devices contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Devices as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the Devices and/or the data contained therein.

8.      The government will retain a forensic image of the Devices for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

**Attachment B**                                                                                                    **Page 5**